UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,                                   Case No. 3:20-cr-65

vs.

CHRISTOPHER JAMES CURRY,         District Judge Michael J. Newman

    Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 30)**

Defendant Christopher James Curry has been indicted on one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), (3), and (9) and 924(a)(2). Doc. No. 13. This case is before the Court upon Defendant's motion to suppress evidence and statements (doc. no. 30), the record and evidence admitted during a hearing on his motion to suppress, and the parties' post-hearing memoranda. Doc. Nos. 41, 42, 43.

**I.**

Agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), in conjunction with the Montgomery County Sherriff's Office ("MSCO") and the Dayton Police Department ("DPD") arrested Defendant on June 10, 2020. Many of the events leading to his arrest are documented in the affidavit of ATF Special Agent ("SA") Kenneth R. Pitney.

The events leading to Defendant's arrest began when Deputies from the MSCO made a traffic stop of a suspicious person driving a red Hyundai Sonata on June 2, 2020. Doc. No. 3 at PageID 7. Once MSCO stopped the Hyundai Sonata, they noticed a shotgun next to the driver's leg. *Id.* On June 3, 2020, an ATF Special Agent interviewed the driver about his possession of the firearm. *Id.* During that interview, the driver stated that the firearm belonged to Defendant, and

that Defendant had left the firearm in the driver's vehicle a few days before. *Id.* The driver additionally informed the agents that Defendant was a prior felon with a history of methamphetamine use. *Id.*

On June 9, ATF agents utilized the driver of the red Hyundai Sonata as a Confidential Informant ("CI") and had him participate in a controlled purchase of evidence ("controlled purchase"). *Id.* SA Pitney equipped the CI with audio/video recording equipment and had him make contact while the Task Force team observed and monitored the situation. Doc. No. 36 at PageID 175. During the encounter between Defendant and the CI, SA Pitney testified that the Defendant was recorded stating "he needed to get the shotgun back, and also that he was attempting to purchase a firearm… because of a problem he had with the mother of his child, Ms. Amanda Howitt, and Ms. Howitt's new boyfriend." *Id.*

The following morning (June 10) at approximately 8:23 a.m., Defendant's mother, Pamela Curry, called 911 to express her concerns that Defendant was suicidal and possibly homicidal. *Id*. at PageID 177. Ms. Curry advised agents that Defendant "had contacted her the previous evening threatening to acquire a firearm in order to kill Amanda Howitt and her new boyfriend … along with himself." Doc. No. 3 at PageID 8. Ms. Curry told the operator that her son had communicated these threats to her via text message and additionally sent a picture of a sawed-off shotgun. Doc. No. 36 at PageID 177, 184-85, 220. She requested law enforcement check in on him. *Id*.

In response to Ms. Curry's call, law enforcement officials were dispatched to Defendant's residence. *Id*. at 177-78. The officers showed up at Defendant's residence at approximately 8:38 a.m. on June 10, 2020. *Id*. at 178. After knocking on the front door, the officers did not receive a response and left the residence. *Id*.

Later that morning, SA Pitney and MCSO Detective Kyle Baranyi called Ms. Curry to set up an interview with her. *Id.* at 184, 194. On June 10, 2020 an ATF SA and an MSCO Detective interviewed Ms. Curry regarding her 911 phone call. Doc. No. 3 at PageID 8. Ms. Curry provided the officers information regarding her son's residence, advised the officers about her son's history with meth and heroin use, and informed them that her son is not legally allowed to possess a firearm. *Id.* Ms. Curry also advised the officers of an incident that reportedly occurred a month before the interview in which Defendant held Ms. Howitt and their children captive at his residence, and beat her to a point where she was unable to stand up. *Id.* Ms. Curry also provided the investigators with the text messages Defendant sent her including the image of the firearm. *Id.* The investigators determined that the picture of the firearm that Defendant sent to Ms. Curry on May 31, 2020 matched the firearm taken from the CI's car during his arrest on June 2, 2020. *Id.* Based on the 911 recording and the interview of Ms. Curry, SA Pitney began drafting both a criminal complaint against Defendant and an application for a search warrant for Defendant's residence. Doc. No. 36 at 181-82.

Around 3:00 p.m. on June 10, 2020, DPD and ATF Task Force Officer ("TFO") Nathan Curley was dispatched to Defendant's residence for surveillance purposes. *Id.* at PageID 220. While TFO Curley was conducting surveillance, "a black four-door Chevrolet Silverado with dark tinted windows and custom wheels" appeared in front of the residence. *Id.* at 221. Using his binoculars, TFO Curley was able to identify Defendant as he exited the passenger side of the vehicle. *Id.* TFO Curley testified during the suppression hearing that he observed Defendant go in the front door of his residence, run back out about a minute later, and then re-enter the passenger side of the same Chevrolet Silverado. *Id.* Once Defendant re-entered the truck, it began to go northbound on North Haven Way. *Id.*

TFO Curley testified that he "followed the vehicle as it traveled north on North Haven Way, and then tried to contact the regional dispatch center to dispatch a deputy to stop that vehicle." *Id*. at 222. TFO Curley was in an unmarked, rental vehicle and was dressed in civilian clothes. *Id*. When asked why he did not stop the vehicle himself, TFO Curley stated, "[o]ne reason, that the suspect we were stopping potentially was armed, and the other reason being that I don't have emergency equipment, equipment on my vehicle in order to notify the person to stop the vehicle…" *Id*. at 223. TFO Curley also testified that there is a Dayton Police Department policy prohibiting officers from using an unmarked vehicle "for the sole purpose of making traffic stops." *Id*. at 223-25.

TFO Curley contacted the regional dispatch centers for both the DPD and the MCSO and was able to obtain assistance from DPD Officers Miniard and Kinstle. *Id*. at 226. As TFO Curley followed the car, he noticed an equipment violation: specifically, "[t]he window tint on the vehicle was very dark, and I couldn't see who was driving vehicle. I believe it was lower than the state allowed limit for, for not allowing light into the passenger area." *Id*. at 227. Additionally, when questioned about probable cause for this vehicle stop, TFO Curley stated, "one reason was for the equipment violation for the dark tint … [a]nd the other reason was the, what I believe is probable cause to say a crime was being committed or about to be committed by Christopher Curry…." *Id*. at 235-36. TFO Curley continued, "[he] had either obtained a firearm or was trying to obtain a firearm for the purpose of committing a homicide and then killing himself." *Id*.

At approximately 3:20 p.m., Officers Miniard and Kinstle stopped the Chevrolet Silverado on I-75 southbound at Second Street in downtown Dayton and identified both the driver and passenger. *Id*. at 226-27. The driver was identified as Chase Meerhof; the passenger was

4

Defendant. *Id*. After Defendant was removed from the Silverado and handcuffed, Officers Miniard and Kinstle took Defendant to the Dayton Safety Building until MCSO came to retrieve him around 4:50 p.m. *Id*. at PageID 228-29.

Defendant was detained for approximately 4 hours and 20 minutes before SA Pitney and Detective Baranyi interviewed him. *Id*. at PageID 238-39. Before the interview began, SA Pitney presented two warrants to U.S. Magistrate Judge Sharon Ovington: an arrest warrant based on the criminal complaint against Defendant; and a search warrant of Defendant's residence. *Id*. at PageID 181. Judge Ovington authorized the arrest warrant and search warrant for Defendant's residence shortly before 6:00 p.m. on June 10. *Id*. at PageID 181-84.

SA Pitney and Detective Baranyi began interviewing Defendant at approximately 7:42 p.m. on June 10 at the Montgomery County Sheriff's Office. *Id*. at PageID 189. The officers read Defendant his Miranda rights; Defendant subsequently waived those rights with a written waiver and agreed to continue the interview. *Id*. at PageID 189-90.

After the officers discussed the reason for Defendant's arrest, SA Pitney showed Defendant the photograph of the shotgun taken from the CI's red Hyundai. *Id*. at PageID 191. Defendant stated that the gun belonged to an individual named "Zac" and stressed that there was exculpatory evidence on his cell phone that he had left in Meerhof's car. *Id.* Defendant insisted that he be permitted to leave due to evidence he believed officers would find on that cell phone. *Id.* SA Pitney informed Defendant that due to his federal arrest warrant, he would not be allowed to leave regardless of what was on the phone. *Id.* Defendant then decided he no longer wanted to speak to the officers; he terminated the interview and stated he "wanted to be booked in." *Id.* The interview concluded at approximately 9:00 p.m. *Id.* at 192.

5

From there, SA Pitney went to Meerhof's house to obtain the cell phone Defendant left in his car. *Id.* Meerhof provided SA Pitney with the cell phone and a charging cable. *Id.* Defendant contends that officers violated his rights under the Fourth and Fifth Amendment in a multitude of ways.

## II.

The Fourth Amendment forbids "unreasonable searches and seizures" by the Government. U.S. Const. art. IV. "'It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'" *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560–61 (6th Cir. 2018) (cleaned up)).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

A defendant may assert a violation of the Fourth Amendment and seek suppression of evidence by filing a pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). The burden is on the defendant to show "a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

### A. Initial Traffic Stop

Defendant first contends officers violated his Fourth Amendment rights by stopping and seizing him without probable cause. Doc. No. 30 at PageID 160-61. The Government maintains that the initial traffic stop was lawfully based on TFO Curley's observation of the Silverado with excessively tinted windows in violation of O.R.C. § 4513.24. Doc. No. 42 at PageID 298.

A police officer may stop the driver of a vehicle without running afoul of the Fourth Amendment when the officer has "probable cause" to believe that a driver has violated a traffic law. *Whren v. United States*, 517 U.S. 806, 810, 812 (1996). "[T]his is true even if the officer is actually motivated by some other purpose, such as investigating an unrelated crime." *United States v. Shelton*, 817 F.App'x 217, 219 (6th Cir. 2020) (citing *Whren*, 517 U.S. at 810-812). In the context of "ongoing" traffic violations, such as "a blocked license plate or, more relevantly, an overly tinted windows," courts apply the less stringent "reasonable suspicion" standard. *Id.*; *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008).

An officer reasonably suspects a window tint violation when they are familiar with their state's window tint law and "estimate that the vehicle [is] substantially darker than permitted by law." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (affirming denial of motion to suppress); *see also Shelton*, 817 F.App'x at 219 (same). TFO Curley testified that "the window tint on the vehicle was very dark, and I couldn't see who was driving the vehicle. I believe it was lower than the state allowed limit for, for not allowing light into the passenger area." Doc. No. 36 at PageID 227. TFO Curley additionally testified that during the course of his career, he has personally stopped vehicles based on suspected violations of the window tint regulation "probably close to 100" times. *Id.*

Here, just as in *Shank* and *Shelton*, TFO Curley directed the officers to stop the car based on the tinted windows, as he was experienced with the window tint law and estimated that the window tint at issue was significantly darker than the allowable limit. For this reason, the officer possessed "reasonable suspicion" of an ongoing traffic violation and, therefore, complied with the Fourth Amendment when he stopped the Silverado in which Defendant was riding.

7

## B. Warrantless Arrest and Detention

Defendant next asserts that after the officers stopped the Silverado and determined he was not in possession of a firearm or other contraband, they violated his Fourth Amendment rights by detaining and subsequently arresting him. Doc. No. 30 at PageID 160-61. The Government contends that Defendant's detention and arrest were lawful because the recorded comments and threats made during the June 9 controlled purchase -- in conjunction with Defendant's mother's 911 call, and subsequent interview -- provided probable cause. Doc. No. 42 at PageID 298.

An officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Similarly, officers may stop to investigate a moving vehicle when the officers have a reasonable and articulable suspicion that "its occupants had engaged, were engaging, or were about to engage in criminal activity." *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). Here, as previously discussed, the officers had reasonable suspicion to stop the Silverado. *See supra* Part II.A.

Once the officers stopped the Silverado, they detained and ultimately arrested Defendant. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is public and there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Here, the Court finds that there were sufficient historical facts and events leading up to the arrest that amounted to probable cause for an objectively reasonable officer to conclude that Defendant was unlawfully in possession of a firearm. First, there were Defendant's comments and threats made to the CI during the recorded June 9, 2020 controlled purchase. Doc. No. 3 at PageID 7-8; Doc. No. 36 at PageID 175 ("He had stated that he needed to get the shotgun back, and also that he was attempting to purchase a firearm so that he could -- because of a problem he had with the mother of his child… and [her] new boyfriend"). Ms. Curry's 911 emergency telephone call and subsequent interview corroborated this by informing officers that her son was not legally permitted to have a firearm, and that he had sent her homicidal and suicidal text messages including a photo of shotgun. Doc. No. 3 at PageID 8; Doc. No. 36 at PageID 177, 184-85, 220.

Together, based on: (1) the knowledge of Defendant's prior criminal record; (2) the threats made during Defendant's recorded conversation with the CI; (3) the 911 call and the officers' review of the text messages sent to Defendant's mother; and (4) the photograph of the gun contained in those messages, the Court finds there were sufficient historical facts and events for an objective reasonable officer to detain and subsequently arrest Defendant for unlawful possession of a firearm. *Pringle*, 540 U.S. at 371.

### C. Search Warrant for Residence

Defendant's argument regarding the search of his residence is two-fold: (1) he argues that the CI used to establish the probable cause for the search warrant was not credible or reliable; and (2) he argues that because the CI never observed firearms in the residence, law enforcement lacked probable cause to search the residence. Doc. No. 30 at PageID 162; Doc. No. 41 at PageID 282-84. The Government responds by relying on the Magistrate Judge's determination that there was sufficient probable cause to issue the warrant, and that decision should be afforded great deference. Doc. No. 42 at PageID 298-99.

The Fourth Amendment provides that "no warrants shall issue but upon probable cause, supported by oath or affirmation…" U.S. Const. amend. IV. There is sufficient probable cause to justify the issuance of a search warrant where an affidavit contains facts that indicate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930) (6th Cir. 1990)). The probable cause determination depends on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

"The review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). The Fourth Amendment requires that the issuing magistrate judge have a "substantial basis" for finding that "a search would uncover evidence of wrongdoing." *Id.* (quoting *Gates*, 624 U.S. at 236, 238). An affidavit establishes probable case where the issuing judge finds that "given all the circumstances set forth in the affidavit… there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A magistrate judge's decision on the existence of probable cause is afforded great deference by the reviewing court. *United States v. Greene,* 250 F.3d 471, 479 (6th Cir. 2001).

Defendant argues that statements provided by the CI did not contain the indicia of reliability necessary to establish probable cause for the search of Defendant's residence. Doc. No. 41 at PageID 284. Defendant contends that the probable-cause determination was based solely on the CI's allegation that the gun found in his car belonged to Defendant. *Id.* However, Defendant's arguments do not to line up with the information contained in the affidavit for the search warrant. *See generally*, Doc. No. 37-5.

The affidavit does not solely rely on the CI's allegation that the gun found in his car belonged to Defendant. *Id.* Instead, the affidavit includes a summary of the information provided by Defendant's mother in her 911 call and her subsequent interview. *Id.* at PageID 319-21. Defendant's mother provided investigators with the text messages Defendant sent her along with a picture of a firearm. *Id.* The affidavit states, "the picture of the firearm CURRY sent Mrs. Curry matches the FIREARM taken from [CI] at his arrest on June 2, 2020. The text message, which included the picture of the FIREARM, was dated May 31, 2020." *Id.* The affidavit additionally includes text messages Defendant sent to his mother that state Defendant's intent to acquire a gun and harm his Ms. Howitt and her current boyfriend. *Id.* The information provided by Defendant's mother, and specifically the photograph of the gun dated May 31, 2020, corroborates the CI's June 2, 2020 claim that Defendant had left the gun in his car. *See United States v. May*, 399 F.3d 817, 824 (6th Cir. 2005); *see also United States v. Williams*, 224 F.3d at 532-33 (upholding a search warrant where "the informant was not identified" because "additional information… corroborates the informer's information sufficiently to find probable cause").

As the CI's information was corroborated by the 911 call and subsequent interview with Defendant's mother, the Court finds there was sufficient probable cause in the affidavit to suspect that Defendant, a known felon, was unlawfully in possession of a firearm. *See May*, 399 F.3d 817 at 824 (affirming the denial of a motion to suppress where there was "substantial information in the affidavit upon which the judge could rest his finding of probable cause"); Doc. No. 36 at PageID 173-74.

Defendant additionally contends that because the CI did not observe firearms in Defendant's home during the controlled purchase, there was not a sufficient nexus between

11

Defendant's home and his alleged criminal activity to justify issuance of the warrant. Doc. No. 30 at PageID 162-63.

The Fourth Amendment requires that a search warrant describe with particularity "the place to be searched and the persons or things to be seized." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016). "[T]he affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *Id.* Whether an affidavit includes a proper nexus is a fact-intensive inquiry evaluated based on a totality of the circumstances test. *See Gates*, 462 U.S. at 238.

While it is true that the CI did not see any firearms in Defendant's home during the controlled purchase, there is no requirement that there be a direct observation of criminal activity in a location to find probable cause. *See generally United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). All that is required is an additional fact in the affidavit that would allow a magistrate judge to infer that evidence of criminal activity could be present in the location to be searched. *See id.*, 544 F.3d at 688 ("[I]n cases that established a nexus between the suspected criminal activity and the suspect's residence "the [search warrants'] affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes" (internal citation omitted); *United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) (listing "type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places" among factors from which magistrate judge can infer nexus between location and alleged criminal activity). Finally, "an issuing judge may infer that a criminal suspect keeps the "instrumentalities and fruits" of his crime in his residence." *Id.* (internal citations omitted).

Here, there were multiple facts from which the magistrate judge could infer a nexus between Defendant's criminal activity and his residence. On May 31, Defendant sent his mother a picture from his home that included a firearm, establishing that he had stored firearms in his residence in the past. Doc. No. 37-5 at PageID 319-21. During the controlled purchase on June 9, Defendant went with the CI to his residence in order to arrange a firearm purchase. *Id.* at 319. During the meeting, Defendant was recorded stating that he was going to buy a gun for himself. *Id.* He also asked the CI to return his 20-gauge shotgun (which Defendant had previously lent the CI) so that he could carry out his threat to kill Ms. Howitt. *Id.* The next day, Defendant's mother called 911 to inform officers that Defendant had called her the previous evening threatening to acquire a firearm to kill his ex-girlfriend and her current boyfriend. *Id.* There was a clear connection between Defendant and his residence as a location where he stored firearms. There was also a clear intent to acquire a firearm, which he most likely would have stored in his home. *Williams*, 544 F.3d at 688. Thus, the magistrate judge reasonably inferred a nexus between Defendant's residence and his alleged conduct that was sufficient to justify issuance of the search warrant for the residence. Consequently, based on a totality of the circumstances, this Court finds that probable cause supported the search warrant for Defendant's residence. *Gates*, 462 U.S. at 230, 238.

Even if this Court were to find that the affidavit relied too heavily on an unreliable informant (which it does not), or that the affidavit did not establish a sufficient nexus between the evidence sought that the place to be searched (also which it does not), the good faith exception would apply here. *See generally United States v. Leon*, 468 U.S. 897 (1984). The good faith exception to the exclusionary rule arises where evidence is seized in reasonable, good faith reliance on a warrant that is subsequently found to be defective. *Id.* at 905. If this Court found there was a

lack of probable cause to issue the search warrant, the issue becomes "whether a reasonable well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th. Cir. 2008) (quoting *Leon*, 468 U.S. at 923 n.23). Suppression is only appropriate when a reasonably trained officer would have known the search was illegal. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017).

There are four circumstances in which an officer's reliance is not objectively reasonable. In this case, the third circumstance applies -- where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)). A "bare bones" affidavit is one that is "so lacking in indicia of probable cause that no reasonable officer" would rely on it. *See United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). It is an affidavit that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *Weaver*, 99 F.3d at 1378).

The affidavit at issue in this case is not a bare bones affidavit. *See White*, 874 F.3d at 496. The affidavit provided by SA Pitney is not one that is "so lacking in indicia of probable cause that no reasonable officer" would rely on it. *Weaver*, 99 F.3d at 1380. It does not merely state "suspicions, beliefs, or conclusions," as it provides substantial underlying factual circumstances that explain the need for a warrant. *Laughton*, 409 F.3d at 748. Therefore, even if there were insufficient facts in the affidavit to establish probable cause, the evidence found based on reliance on the search warrant would be saved by the good faith exception.

**D. Search Warrant for Phone**

Defendant asserts that the search warrant for his cell phone violated the Fourth Amendment because the CI who supplied the information was not sufficiently credible or reliable enough to

provide probable cause.[1] The Government contends that the warrant complied with the Fourth Amendment because the issuing magistrate judge properly determined that there was probable cause. Doc. No. 42 at PageID 298-99.

As addressed in Part II.C, the Court finds that the 911 call and subsequent interview with Defendant's mother provided corroboration for the CI's statement that the gun in the CI's car belonged to Defendant. *See supra* Part II.C; *see also May*, 399 F.3d at 824. Additionally, the July 2, 2020 affidavit attached to the search warrant for Defendant's phone (issued weeks after the search warrant for Defendant's residence) contained even more factual information than the affidavit attached to the search warrant for the residence, supporting a finding that there was probable cause to search Defendant's phone. *See* Doc. No. 37-8.

Again, even if this Court were to find that the affidavit lacked probable cause -- which it does not -- the affidavit is not "bare bones" and therefore the good faith exception applies and the evidence received in connection with the search warrant for the phone would not be excluded. *See White*, 874 F.3d at 496.

### III.

The Fifth Amendment to the Constitution bars the use of an involuntary confession. *Miranda v. Arizona*, 384 U.S. 436, 444 (1996). For statements made during an interrogation to be admissible, a defendant must "voluntarily, knowingly, and intelligently" waive his or her *Miranda*

---

[1] Defendant argues in his motion that a search warrant for his Samson model SM-A102U cell phone was not received, and without a warrant, this was an unlawful search. Doc. No. 30 at PageID 163. Defendant notes, "[a]t the time of writing this Motion to Suppress, no search warrant for the phone has been received by Defendant." *Id.* at PageID 163 n. 2. When questioned about this during the motion to suppress hearing, SA Pitney stated that he obtained a search warrant for the contents of Defendant's cell phone on July 2, 2020. Doc. No. 36 at PageID 196-97. The search warrant for Defendant's cell phone was introduced as Government's Exhibit 7. SA Pitney testified that he prepared the supporting affidavit for that search warrant and all of the facts contained in that supporting affidavit were true and correct to the best of his knowledge. *Id.* at PageID 196-97.

rights. *Id.*; *see Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A two-prong inquiry is used to determine whether a defendant has legally waived their *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The first prong evaluates the voluntariness of the confession. *Id.* ("the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"); *see United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). "For a defendant's confession to be involuntary, and therefore procured in violation of the Fifth Amendment, 'coercive police activity' must have preceded the confession." *United States v. Hunter*, 332 F.App'x 285, 288 (6th Cir. 2009); *Connelly*, 479 U.S. at 167. A confession is involuntary due to police coercion where: (1) "the police activity was objectively coercive"; (2) "the coercion in question was sufficient to overbear the defendant's will"; and (3) "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (citing *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

The second prong focuses on whether a defendant "knowingly and intelligently" waived their rights. *Moran*, 475 U.S. at 421. To satisfy this prong, a defendant must have waived their rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* While a defendant need not understand every possible consequence of waiving their Fifth Amendment privilege, defendant must be aware that they can choose not to talk to law enforcement officers, choose to only speak with counsel present, or stop the questioning at any time. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)).

Courts examine the totality of the circumstances as to both prongs to determine whether a defendant's statement to the police was voluntary. *Mahan,* 190 F.3d at 422. The government must establish the voluntariness of the accused's statements by a preponderance of the evidence standard. *Connelly*, 479 U.S. at 168.

Under the first prong of the analysis, Defendant does not allege any police coercion but instead contends that he was incapable of "voluntarily, knowingly, and intelligently" waiving his *Miranda* rights because he was under the influence of methamphetamine. Doc. No. 30 at PageID 161-62; Doc. No. 41 at PageID 284-87. As Defendant fails to demonstrate, or even allege, that any of the three requirements for finding a confession involuntary due to police coercion were present during his interrogation, this Court finds that Defendant's confession was not involuntary due to police coercion under the totality of the circumstances. *Ray*, 803 F.3d at 266 (citing *Mahan*, 190 F.3d at 422).

As to the second prong of the analysis, generally, a confession cannot be considered involuntary unless Defendant alleges some sort of police coercion. *United States v. Mayhew*, 380 F.Supp. 2d 915, 922 (S.D. Ohio 2005) (citing *Connelly*, 479 U.S. at 167). However, a court may consider whether extreme intoxication rendered a confession involuntary under the "knowing and intelligent" prong. *See Montgomery*, 621 F.3d at 572-75 (noting, in reference to the Fifth Amendment, that "in some settings, the influence of drugs… or alcohol may tip the balance in favor of finding a lack of [mental] capacity"). "Drug-induced impairment… is a matter of degree, making it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." *Montgomery*, 621 F.3d at 572.

Courts that have considered whether drug-impaired suspects could satisfy the "knowing and intelligent" prong of a Fifth Amendment waiver have nearly universally found that

intoxication alone will not render a confession involuntary. *See, e.g., United States v. Brown*, 443 F.App'x 956, 958-59 (6th Cir. 2011) ("Brown… argues that his cognitive impairments and possible drug use rendered his waiver, and the confessions themselves, involuntary. But some kind of 'coercive police activity' is required to establish that a waiver of *Miranda* rights, or a confession for that matter, was involuntary"); *United States v. Treadwell*, 11 F.App'x 502, 510 (6th Cir. 2010) (finding that ingestion of more than five times the prescribed dose of Trazodone prior to interrogation did not make defendant's confession involuntary); *United States v. Chapman*, 112 F.App'x 469, 474 (6th Cir. 2004) (where defendant did not argue that the police coerced him in any way, defendant's confession was not involuntary merely because he was in a "heroin-befuddled state"); *Marcum v. Knight*, 922 F.2d 841 (6th Cir. 1991) (concluding that defendant's blood alcohol level of 0.25 was insufficient to render confession involuntary).

In the instant case, SA Pitney testified that Defendant was "very alert," "very coherent," and appeared able to understand everything he was asked. Doc. No. 36 at PageID 195. He testified that there was no indication that Defendant was confused in any manner. *Id.* Defendant was read his *Miranda* rights and signed the waiver form, indicating he understood that any statement could be used against him and that he had a right to consult with counsel prior to making any statement. *See* Doc. No. 37-7. Finally, Defendant was aware he could terminate the interview because he consciously chose to stop the interview and tell police he wanted to be booked in. Doc. No. 36 at PageID 182. Even assuming Defendant was under the influence of methamphetamine, such intoxication does not render his confession involuntary under the totality of the circumstances. *See Montgomery*, 621 F.3d at 573-74; *Dunn*, 269 F.App'x at 572. A preponderance of the evidence establishes that Defendant "voluntarily, knowingly, and intelligently" waived his *Miranda* rights. *Mahan,* 190 F.3d at 422.

## IV.

For all the above reasons, Defendant's Motion to Suppress (doc. no. 30) is **DENIED**.

**IT IS SO ORDERED.**

July 13, 2021                                                        s/Michael J. Newman
                                                                                Hon. Michael J. Newman
                                                                                United States District Judge